**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Mar 19 2014, 10:08 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**AMY KAROZOS**
Greenwood, Indiana

ATTORNEYS FOR APPELLEE

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**CHRISTINE REDELMAN**
Deputies Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE )
TERMINATION OF THE PARENT-CHILD )
RELATIONSHIP OF: )
       )
J.E. (Minor Child), )
       )
  And )
       )
C.E. (Father), )
       )
  Appellant-Respondent, )
       )
    vs. )   No.  49A02-1309-JT-749
       )
THE INDIANA DEPARTMENT OF )
CHILD SERVICES, )
       )
  Appellee-Respondent. )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Larry Bradley, Magistrate
The Honorable Marilyn Moores, Judge
Cause No. 49D09-1302-JT-5937

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**ROBB, Judge**

<u>Case Summary and Issues</u>

C.E. ("Father") appeals the trial court's termination of his parental rights to J.E, his daughter. He raises two issues for review: 1) whether the Department of Child Services ("DCS") failed to prove by clear and convincing evidence that there was a satisfactory plan for J.E.; and 2) whether the termination of Father's parental rights violated his due process rights since the termination was based solely on his incarceration. Concluding there was a satisfactory plan for J.E. and Father's due process rights were not violated, we affirm.

<u>Facts and Procedural History</u>

Father has been incarcerated in federal prison since November 2011 on three charges: distribution of child pornography, possession of child pornography, and tampering with a witness. In June 2012 he was convicted on all three counts and sentenced to four hundred and eighty months in prison. R.E.[1] ("Mother"), Father's wife, gave birth to J.E. on March 27, 2012, while Father was in prison. On April 24, 2012, DCS filed a

---

[1] She is also referred to as R.S. in the record.

petition alleging J.E. was a child in need of services ("CHINS") because Mother had two-week-old J.E. with her while she was prostituting at a lingerie shop. Mother informally placed J.E. with Father's step-aunt ("Aunt"), and shortly after, DCS requested that J.E. be officially removed from Mother's care and placed with Aunt.

At an August 6, 2012, hearing, Mother admitted to an amended CHINS allegation that she had unstable housing and intervention was necessary to ensure J.E.'s safety and well-being, and Father waived fact-finding and agreed to proceed to disposition with no services ordered until he was released from incarceration. The initial plan for J.E. was reunification with her parents, but eventually the plan was changed to adoption. On February 14, 2013, DCS filed a petition to involuntarily terminate Mother's and Father's parental rights. The termination hearing was originally set for May 2013, but because Father's criminal appeal was still pending, the court granted a continuance to July 2013. A motion to continue the July trial date while Father's appeal was pending was denied, and the termination hearing was held July 31, 2013.[2] Father was incarcerated out of state but participated in the hearing by videoconference. Father opposed the termination of his parental rights and stated he had participated in the CHINS and termination cases to the extent he was able. He objected to J.E.'s placement with Aunt because Aunt was not facilitating Father and J.E.'s relationship or a relationship between J.E. and her sibling; Father instead wanted his father to have guardianship of J.E. while maintaining his parental rights. He also argued that Aunt was unsuitable because she was a prostitute. The trial

---

[2] Mother signed a consent to adopt before the termination hearing; only Father's parental rights were at issue.

3

court entered an order terminating the parent-child relationship on August 5, 2013. Father now appeals. Additional facts will be provided as necessary.

Discussion and Decision

I. Satisfactory Plan for J.E.

A. Standard of Review

The Fourteenth Amendment to the United States Constitution protects the right of parents to establish a home and raise their children. *In re J.S.O.,* 938 N.E.2d 271, 274 (Ind. Ct. App. 2010). The involuntary termination of parental rights is an extreme measure to be used only when all other reasonable efforts have failed. Id. The interests of the child trump the interest of the parent, though, when evaluating the circumstances surrounding termination of a parent-child relationship. In re J.H., 911 N.E.2d 69, 73 (Ind. Ct. App. 2009), trans. denied.

In reviewing the termination of parental rights, we give deference to the trial court's unique position to assess the evidence. Id. Therefore, we consider only the evidence and reasonable inferences that are most favorable to the judgment. In re G.Y., 904 N.E.2d 1257, 1260 (Ind. 2009). When reviewing findings of fact and conclusions of law involving a termination of parental rights, we apply a two-tiered standard of review: first, we determine whether the evidence supports the findings, and second whether the findings support the judgment. Id. We will not reweigh the evidence or judge witness credibility and will set aside the trial court's judgment only if it is clearly erroneous. Id.

The requirements for involuntary termination of the parent-child relationship are codified in Indiana Code section 31-35-2-4(b)(2). The State must show:

(A) that one (1) of the following is true:

    (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

    (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

    (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

    (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

The State must present clear and convincing evidence of each of those elements. In re S.P.H., 806 N.E.2d 874, 880 (Ind. Ct. App. 2004); Ind. Code § 31-37-14-2. Failure to prove even one of the elements is sufficient to reverse a termination of a parent-child relationship. See In re G.Y., 904 N.E.2d at 1261.

## B. Satisfactory Plan

Here, Father challenges only proof of the requirement of Indiana Code section 31-35-2-4(b)(2)(D) that there was a satisfactory plan for the care and treatment of J.E. Regarding the plan for J.E., the trial court made the following findings and conclusions:

13. There is a reasonable probability that the conditions that resulted in [J.E.]'s removal and continued placement outside the home will not be remedied by her father. [Father] was incarcerated and unavailable to parent

5

at the beginning of the ChINS [sic] case, and he will be incarcerated and unavailable to parent until [J.E] is forty years of age.

14. Continuation of the parent-child relationship poses a threat to [J.E]'s well-being in that it would pose as a barrier in obtaining permanency for her through an adoption.

15. [J.E.] has been in kinship care since June of 2012. This placement is preadoptive and [J.E.] has been observed as having bonded with all the people in the home, and is well cared for.

16. Termination of the parent-child relationship is in the best interests of [J.E.]. Termination would allow [J.E.] to be adopted by the only family she has known and into a stable and permanent environment where her needs will be safely met.

17. There exists a satisfactory plan for the future care and treatment of [J.E.], that being adoption.

18. [J.E.]'s Guardian ad Litem agrees with the plan of termination and adoption as being in [J.E.]'s best interests to provide for permanency and stability.

Father admits that DCS had a plan for J.E.: adoption. Father argues that this was not a satisfactory plan because there were allegations against Aunt that she is a prostitute; that Aunt does not allow J.E. to have any contact with her blood relatives; and that Father's father was willing to care for J.E. Father does not specifically challenge any of the trial court's findings relating to whether there was a satisfactory plan; rather, he believes that relative placement with his father would be a better alternative to termination.

The State argues, and we agree, that this case is analogous to In re B.M., 913 N.E.2d 1283 (Ind. Ct. App. 2009). In In re B.M., the father was facing a prison sentence of twenty years to life, and DCS filed a petition to terminate his parental rights. The father argued that his sister would be willing to care for the child, but the sister was never contacted about

6

the suggested arrangement nor did she appear in court on the matter. This court held the termination of parental rights was appropriate despite the fact that the Father's proposed alternative living arrangement was not considered. Id. at 1286-87.

Similarly, here, Father suggested an alternate place for J.E. to live instead of terminating his parental rights; he also argued that the relative placement could continue as is without requiring his parental rights be terminated. Father's father was never interviewed by the family case manager, guardian ad litem, or the court about placement. Father's father also did not appear at the hearing to testify whether he would actually be willing to accept placement of the child. Despite Father's argument that there was an alternative, "DCS is only required to establish that there is a satisfactory plan for the care and treatment of the child in termination proceedings." Id. at 1287 (internal quotations omitted). Adoption is a satisfactory plan for the care and treatment of a child in termination proceedings. Id. For these reasons, we cannot say that the trial court's termination of Father's parental rights was clearly erroneous.

## II. Due Process

### A. Standard of Review

Father next argues that his due process rights were violated because DCS failed to follow the statutory requirement of making a reasonable effort to reunify the family in the CHINS case leading to termination. Due process in parental rights cases involves the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing government interest supporting the use of the challenged procedure. In re C.G., 954 N.E.2d 910, 917

7

(Ind. 2011) (citing <u>Mathews v. Eldridge</u>, 424 U.S. 319, 335 (1976)). Father's interest in the care, control, and custody of his child is a substantial interest. <u>Id.</u> Likewise, the State's *parens patriae* interest in protecting the welfare of J.E. is substantial. <u>Id.</u> We must then examine the third factor: the risk of error created by DCS's actions and the trial court's actions. "[P]rocedural irregularities in a CHINS proceeding may be of such import that they deprive a parent of procedural due process with respect to the termination of his or her parental rights." <u>A.P. v. Porter Cnty. Office of Family & Children</u>, 734 N.E.2d 1107, 1112-13 (Ind. Ct. App. 2000), <u>trans. denied</u>.

## B. Father's Due Process Rights

We note here that Father does not argue that he did not receive notice of the hearings, that he was unable to participate in hearings while he was incarcerated, or that he was unable to be heard at those hearings. His due process argument is that the DCS failed to attempt reunification between Father and J.E. as it was required to do.[3] He further argues that a father's relationship with his child cannot be terminated simply because he is incarcerated,[4] and a parent's incarceration does not relieve DCS of its duty to attempt reunification.

---

[3] To the extent Father argues that DCS failed to consider alternative placements under the due process argument, his argument is indistinguishable in substance from the argument based on sufficiency of the plan, addressed *supra*, Section I.B.

[4] Father cites no authority on this point; rather, he relies on Indiana Code sections 31-34-21-5.6(b) and 31-35-3-4 which provide exceptions to the requirement to make reasonable efforts to preserve and reunify families and crimes upon which a petition to terminate a parent-child relationship may be based, respectively. He argues that since his crime did not fit into one of these exceptions, DCS was required to make a reasonable effort to preserve and reunite his relationship with his daughter while he is serving a forty-year prison sentence. Under these circumstances, we do not believe DCS failed to make a reasonable effort to reunite Father with daughter.

Father did not raise this issue at the trial court, so in order to succeed on a claim when it has not been preserved, he must be able to show it was a fundamental error. Konopasek v. State, 946 N.E.2d 23, 27 (Ind. 2011). "To overturn a trial court ruling based on fundamental error, we must conclude that the error was a clearly blatant violation of basic and elementary principles, and the harm or potential for harm therefrom must be substantial and appear clearly and prospectively." In re M.M., 733 N.E.2d 6, 11 (Ind. Ct. App. 2000) (quotations omitted). While we agree that the harm to Father, the termination of his parental rights, is substantial and clear, he has failed to show how DCS's reunification efforts would have ever been successful since J.E. will be well into adulthood by the time Father is released from custody. Any failure on DCS's part to attempt reunification does not rise to the level of fundamental error. See Castro v. State Office of Family & Children, 842 N.E.2d 367, 377 (Ind. Ct. App. 2006), trans. denied. We also note that it was not the fact that Father was incarcerated that lead his rights to be terminated; it was the fact that he will be unable to provide food, shelter, clothing, support, or care for his daughter for the entirety of her childhood that led to the termination decision. For these reasons, we conclude Father was not denied due process in the termination proceedings.

## Conclusion

Concluding that DCS's plan of adoption for J.E. was satisfactory and Father was not denied due process in the termination proceedings, we affirm.

Affirmed.

BARNES, J., and BROWN, J., concur.

9